H. ACKERMAN, Master of American schooner Geo. C. Perkins
*vs.* J. H. CONGDON. *In Re* H. M. Whitney and A. T.
Atkinson, for Contempt of Court.

JANUARY TERM, 1887.

JUDD, C.J., McCULLY, PRESTON and BICKERTON, JJ. FORNAN-
DER, J., absent.

Publications tending to influence the result of a pending suit, held to
be misconduct, punishable summarily as Contempt of Court.

OPINION OF THE COURT, BY JUDD, C.J.   McCULLY, J., dissenting.

At the instance of one J. H. Congdon, defendant in a case
then pending in the Supreme Court, wherein H. Ackerman,
master of the American schooner Geo. C. Perkins, was plaintiff,
the Court issued a rule citing the respondents, H. M. Whitney
and A. T. Atkinson, as publisher and editor respectively of the
Hawaiian Gazette newspaper, to appear and show cause why
they should not be adjudged guilty of a contempt of Court, in
having printed and published in the said newspaper, in its issue
of December 28th, 1886, the following article:

"THE OTHER SIDE OF THE QUESTION.

"The circumstances attending the arrest of Mr. J. H. Cong-
don, of San Francisco, while about to leave for that city on
Wednesday last by the steamer Australia, are as follows:   On
October 17th, the bark Geo. C. Perkins arrived here, consigned
to the house of F. A. Schaefer & Co. of this city, and on her
manifest appeared 250 hogs, shipped on deck by J. H. Congdon,
in which the ship assumed no responsibility.   It appears that
some forty of the porkers died on the passage down, while 210
were delivered to the owner alive.   So far as the ship is con-
cerned, no accident occurred to cause death, and the only excuse
was that the hogs were over-fed and died from suffocation.

"The hogs were cared for by the owner, and were consigned to 'order' on the manifest. An order to Messrs. Schaefer & Co. was received to collect the freight money, $590.62, the full amount on 250 hogs, (and inserted across the face of the bill of lading, in red ink, were the words, 'payable in full, dead or alive'), which was not paid at the time of delivery of the hogs to 'order' here. Congdon refused to pay freight until the ship had paid for the forty dead hogs, which the agents would not agree to. Meantime Congdon returned to San Francisco, without conferring with Messrs. F. A. Schaefer & Co., or stating that McChesney & Son were his agents—in point of fact the agents of the Geo. C. Perkins had no knowledge of McChesney & Son in the matter. Messrs. F. A. Schaefer & Co. entered suit in the Supreme Court for the recovery of the freight money on said hogs. On Sunday last J. H. Congdon returned to Honolulu on the bark Ella, and on Monday morning the necessary papers were served on Congdon by Officer Fehlber, to appear before the Court and defend himself. On Wednesday it was rumored that Congdon was going to return to San Francisco by the Australia, when a bench warrant was issued for his arrest by Judge McCully of the Supreme Court. The warrant was served about fifteen minutes before the steamer left the port, and Congdon only arrived on board five minutes before the serving of the warrant. Congdon's name was not on the list of passengers, and having been less than the required thirty days, did not need a passport to leave the Islands. When arrested he stated that McChesney & Son were his agents, and would make matters all right. Had he filed a bond with sureties, Congdon would have been allowed to depart. Messrs. F. A. Schaefer & Co., the agents, were compelled to pursue this course in order to save themselves for the loss of the freight money, for which the firm was virtually responsible to the owners of the Perkins in San Francisco, and merely carried out their written instructions. Had Mr. Congdon taken the necessary steps to have himself represented by responsible parties, or filed a proper bond, he would have saved himself a great deal of trouble and annoy-

ance, and could have left when he pleased. It is best to be 'square.'

"On Thursday a writ of *habeas corpus* was sued out by J. H. Congdon's counsel, and was argued before His Honor the Chief Justice, who, on Friday, rendered a decision adverse to the writ, and remanding Congdon into the custody of the Marshal. Counsel for the defendant noted an appeal to the full Court in Banco. So the end is not yet."

The rule was returned on the 8th January, 1887. The affidavit of the applicant for the rule alleged " that the material statements in the article so published were false; that they reflect injuriously upon the petitioner, and are calculated to cast unjust suspicions of dishonesty upon his character, and to prejudice the public with respect to the merits of said case, and to prejudice and impair his right to a just and impartial decision of said case so pending as aforesaid, by and on the part of the jury therein, and to impede, embarrass and obstruct the course of justice therein."

At the hearing the respondents, who were not represented by counsel, admitted the publication of the article, the material for which had been collected from, as they believed, reliable sources. They disavowed any intention to commit a contempt of Court, and submitted to the judgment of the Court whether the publication of the article could be so construed.

*C. W. Ashford*, for petitioner.

The plain effect of the article is to prejudice the minds of the public unfavorably to the petitioner and his case now pending.

The publication is therefore punishable as a contempt.

### BY THE COURT.

The questions involved in this matter are of such wide importance to the newspaper press in general and to the public at large, that we deem it necessary to discuss them at some length.

The statute laws of this Kingdom in respect to contempts are Sections 18, 19 and 20 of Chapter XXIX. of the Penal Code

(1869), and the 24th Chapter of the Civil Code, being Sections 1096, 1097 and 1098 thereof (Compiled Laws, pp. 318–319). The Penal Code (Section 18, Chapter XXIX.) reads: "Whoever, after trial by jury, is adjudged guilty of contempt of any Judicial Court, whether by open resistance to the process or proceedings thereof," etc. * * * " or by publishing *animadversions on the evidence or proceedings in a pending trial*, tending to prejudice the public respecting the same, and to obstruct and prevent the administration of justice; or by knowingly *publishing an unfair report of the proceedings* of a Court, or malicious invectives against a Court or jury tending to bring such Court or jury or the administration of justice into ridicule, contempt, discredit or odium, shall be punished," etc.

It is suggested that the article in question does not come under any of the above definitions of contempt, as above italicized for convenience. It is clear that it does not.

The article is not an animadversion on the evidence or proceedings in a pending trial, nor is it a report fair or unfair of the proceedings of a Court, nor does it contain any invectives against a Court or jury. The case of *Ackerman vs. Congdon* had indeed been commenced, and the statutory authority of arrest of the defendant had been invoked; but at that time no evidence had been taken in Court which could be made the subject of animadversion or unfair report.

How then can this article be held to be a contempt of Court? *Expressio unius est exclusio alterius.* The article, containing no comment on evidence which had been adduced in Court, or upon any proceedings in Court, is not punishable as a contempt under the section of the Penal Code and in the method prescribed—that is, by *a trial by jury*—which pre-supposes an examination by a committing magistrate and an indictment presented by the Attorney-General and found by the Court.

We are now met with the inquiry whether any other conduct or publication, than that defined and specified in the section of the Penal Code above referred to, can be held to be a contempt.

Section 1096 of the Civil Code (which is incorporated in the

latter part of the section of the Penal Code above referred to) reads: "Every judicial tribunal, acting as such, and every magistrate acting by authority of law in a judicial capacity, may summarily punish persons guilty of contempt, as follows."

To punish summarily means that the Court or magistrate may entertain the case and proceed to final judgment therein without submitting it to a jury upon an indictment duly presented and found. Such a power, as laid down by all jurists and text writers, is inherent in Courts of Record, even when not expressly given by statute.

Contempts which may thus be summarily punished are not enumerated and defined by the section now under consideration, (Civil Code, Sec. 1096).

That they are not limited to those enumerated by Section 18 of the Penal Code above referred to, is made clear by Section 1097 of the Civil Code, which reads: "Persons punished according to the provisions of this Chapter (Chap. XXIV. Civil Code, of Contempts) shall also be liable to indictment for the same misconduct, if it be an indictable offense; but the Court before which a conviction is had on the indictment, in passing sentence, shall take into consideration the punishment before inflicted."

We have here what is an apparent anomaly in penal jurisprudence, that a person is liable to be punished twice for the same offense. But this law plainly has in view two classes of contempts, one that may be punished upon conviction after trial by jury, upon an indictment therefor, which is also punishable summarily, and another class punishable summarily but not indictable, because not enumerated in Section 18, Chapter XXIX., of the Penal Code, as an indictable offense.

We are reinforced in the position that the Court is at liberty to construe as contempts of Court other misconducts of that character which are not enumerated in the section of the Penal Code referred to, by the wording of Section 1098 of the Civil Code, wherein the power is given to the Court where the contempt consists in the omission or refusal to perform an act,

which is yet in the power of the party to perform, to imprison the party until he has performed it. Such a contempt is not an indictable offense; it is not specified in the Penal Code, and it is, nevertheless, punishable summarily as above indicated.

Having come to the conclusion that an act of misconduct may be found by the Court to be a contempt, though it is not one of those enumerated in the section of the Penal Code under discussion, our next inquiry to meet is whether the article in question is of such a nature.

The suit of *Ackerman vs. Congdon* was to recover freight on an invoice of hogs. The defense is stated to be that a number of hogs died on the passage, for which the shipper seeks to hold the plaintiff responsible. The statement is made in the article in the *Gazette* that "so far as the ship is concerned, no accident occurred to cause death, and the only excuse was that the hogs were over-fed, and died from suffocation." This is put forward by petitioner's counsel as a "publication tending to influence the result of a pending suit," and therefore a contempt of Court.

In *Daw vs. Eley*, Law R., 7 Eq. Cases, 49, a suit was pending to restrain the infringement of a patent in which one of the issues was the novelty of the plaintiff's invention. The defendant's solicitor wrote a letter under an assumed name, which was published, stating facts which would tend to disprove the novelty of the invention : held, that the solicitor had been guilty of a contempt of Court in writing for publication letters tending to influence the result of the suit. Lord Romilly, M.R., says : " The principle is quite established in all these cases that no person must do anything to pervert the sources of justice or the proper flow of justice; in fact, they ought not to make any publications, or write anything which would induce the Court, or which might possibly induce the Court or the jury—the tribunal that will have to try the matter—to come to any conclusion other than that which is to be derived from the evidence in the cause between the parties; and certainly they ought not to prejudice the minds of the public beforehand by mentioning circumstances relating to the case."

In the case of the *Printer of the Champion*, (*Roach vs. Hall*), 2 Atk., 469, Lord Hardwicke laid down the rule which has ever since been acted upon in England : " Nothing is more incumbent upon Courts of Justice than to preserve their proceedings from being misrepresented, nor is there anything of more pernicious consequence than to prejudice the minds of the public against persons concerned as parties in causes before the cause is finally heard. It has always been my opinion, as well as the opinion of those who have sat here before me, that such a proceeding ought to be discountenanced."

*In Re Cheltenham and Swansea Railway and Carriage Co.*, L. R. 8 Eq. Cases, 583, the V. C., Malins, held that it was contempt of Court merely to publish *in extenso* a petition for the winding up of a company, which contained certain grave and serious charges with reference to the conduct of the directors. Sir R. Malins says, " the broad question is whether it is allowable for the publishers of a newspaper to print proceedings pending in the Court, before such proceedings have come on to be heard. The principle is equally applicable to any bill or answer or petition, which may be filed in this Court ; the statements therein contained being necessarily *ex parte*, and unaccompanied by any evidence or pleadings on the other side. \* \* \* It appears to me that whenever a newspaper, either on its own motion or at the instigation of others, publishes the proceedings in a cause before the hearing, it tends to prejudice the minds of the public. The present case falls within the rule, and I must regard the publication of this petition as a contempt of Court."

In the case against *Onslow & Whalley, M.P.'s*, for contempt of Court, for making speeches at public meetings alleging that defendant (the Tichborne claimant) was not guilty, and that there is a conspiracy against him, and that he cannot have a fair trial—the case being pending and the day fixed for trial— Cockburn, C.J., said : " This Court has always held that a comment made on a criminal trial or other proceedings, when pending, is an offense against the administration of justice, and a contempt of the authority of this Court. (L. R. 9 Q. B. Cases, 227).

In *Rapalje on Contempts*, p. 70, the author says: "Any publication pending a suit, reflecting on the Court, the parties to the suit, the witnesses, the jurors, or the counsel, is a contempt of Court," citing, *inter alia, People vs. Wilson*, 16 Am. R., 528.

In view of these authorities, we are of opinion that the publication of the article in the Hawaiian Gazette is a contempt of Court. The case was pending. The article states as facts circumstances that would tend to prejudice the Court and jury against the defendant's case, as indicating that he had no defense to the action. Also an expression towards the end of the article—"It is best to be square," is a plain imputation that defendant's conduct was not square, *i.e.* dishonest. Such an expression is calculated to prejudice the tribunal which was to try defendant's case, and render it unfavorable to him. The case before us does not disclose a grave instance of contempt, and does not call for a marked punishment, but that it does fall within the principles we have adopted above, is clear.

It is no defense that other newspapers had already published comments reflecting on the plaintiff's action in this case, and that in the spirit of "fair play" which, it is said, is a characteristic of a "free press," the "other side of the question" was written. Whenever our attention is called to publications which in the discretion, which the Court is bound to exercise temperately and wisely, appear to be calculated to have a prejudicial effect upon the rights of parties in cases pending in our Courts, we are bound to notice them, as tending to prevent the even flow of justice, and punish them as contempts. As the case before us is the first instance of constructive contempt of this character brought to our notice, and as the case is not a serious one, we impose no fine. The judgment of the Court is that the respondents are guilty of a contempt of Court, and must pay costs, which are taxed at $5.

*Ashford & Ashford*, for the Rule.

The Respondents in person.

DISSENTING OPINION OF MR. JUSTICE McCULLY.

The first Hawaiian statute relating to Contempt is found in the Act to Organize the Judiciary Department, enacted September, 1847, Section 8, Chapter I. of Vol. 2. It provides that the said Courts, being Courts of record, have power to punish summarily any person guilty of the following acts : six classes of acts are enumerated. The maximum penalties are fixed, and there is a proviso that persons punished for contempt under any of these provisions shall, notwithstanding, be liable to indictment for such contempt, if the same be an indictable offense.

This Act was expressly repealed by Section 1491 of the Civil Code, May 17, 1859, but had been amended by implication by the provisions of the Penal Code, first enacted June 21, 1850, in Sction 18 of Chapter XXX., which somewhat more fully and particularly enumerates acts of contempt which, on conviction in a jury trial, may be punished by certain penalties. It also provides that every judicial tribunal, acting as such, may punish contempts by summary proceeding, upon a scale of penalties, differently prescribed to the different Courts.

The Civil Code (1859) has a Chapter XXIV., entitled " Of Contempts." It provides for the summary punishment of contempt, with a scale of punishments, which may be imposed by the Supreme Court, Circuit Court, Circuit Judge, District Justice, etc. No definition or description of acts which may be considered contempts is given in this chapter. The penalties are slightly varied from those prescribed in Chapter XXX. of the Penal Code of 1850, but otherwise it is a re-enactment in the Civil Code of the provision in the Penal Code for summary punishment of contempt, omitting, however, the enumeration of acts which are contempt, and the provision for trying such by jury, and the penalty following such conviction. But it adds to the statutes upon contempt by Section 1097, that persons punished summarily shall also be liable to indictment for the same misconduct, if it be an indictable offense, the Court, in passing the second sentence, to take into consideration the previous penalty, and by Section 1098, the provision that when the con-

tempt consists in the omission or refusal to perform an act which is yet in the power of the party to perform, he may be imprisoned until he have performed it.

The last legislation is the enactment of the new or compiled Penal Code, 1870, which retains the description of offenses, and subjoins the 24th Chapter of the Civil Code, in place of the former list of penalties for contempt punished summarily, with also Sections 1097 and 1098.

It appears from this statement of the statutes that we have always had a statute describing acts which are contempts of Court, and providing for the summary punishment of them, and, in addition, that when they are indictable offenses, they may also be presented on indictment, and further punished.

The view taken by the Court is that there may be also other acts not prescribed in the statute which may be held and punished for contempts under the common law power of the Court, and that this is intimated by Section 1097 in the phrase, "persons punished according to the provisions of this chapter shall also be liable to indictment for the same misconduct, if it be an indictable offense."

My construction of this is, that persons who have been punished summarily, which is what this chapter prescribes, may also be proceeded against by indictment, and that the offenses, not being defined in this chapter, for which a penalty may be imposed summarily, are those which are described in the statute which enumerates contempts, and no others.

Section 1098, which allows a conditional term of imprisonment, does not seem to me to authorize an enlargement of cases beyond the statute; it merely providing this new mode of penalty for cases in the statute which it might apply to, for instance, "refusal to answer as a witness," or "refusal to answer legal and proper interrogations," "willful disobedience of any lawful process or order."

If we were without statutes prescribing for contempt, the Court might be left to its inherent power of self-protection, and would probably find its rules in the common law authorities.

This is only conjectural. The need of such a power in the Courts was recognized from the beginning by statutes granting that power, and I am unable to assent to the conclusion of the Court that, besides the expressly enumerated acts of contempt, the Court can hold other acts to be contempts, and subject summarily to penalties of fine, imprisonment, or both. This Court has often had occasion to hold that the common law, *eo nomine* and *proprio vigore*, did not exist here.

The terms of Section 18 of Chapter XXX. of the old Penal Code, being Chapter XXIX. of the new Penal Code, in describing contempts, are definite and not general. Says Broom, in commenting on the maxim, *expressio unius est exclusio alterius :* "It sometimes happens that in a statute, the language of which may fairly comprehend many different cases, some only are expressly mentioned, by way of example merely, and not as excluding others of a similar nature. Sometimes, on the contrary, the expressions used are restrictive, and intended to exclude all things which are not enumerated."

The citation made by the Court of that part of the statute which concerns contempts by newspaper publication, it will be seen, contains no general provision for "like or similar" cases, and, in the view of the Court, cannot be extended to the case before us. With great respect, I dissent from the view that cases of publication, not coming within the statute, can be treated as contempts.

Upon the newspaper article under consideration I will only say, in addition to the view of the Court that there is no animadversion on evidence in a pending trial, that I regard the sentence "it is best to be *square*" as applying not to the merits of the pending trial, viz.: the question whether Congdon was or was not justly indebted for the whole bill of freight : but to the proceeding of the arrest, which was a measure taken to procure his attendance at the trial, or to obtain security for any judgment which might be gained—a proceeding which is applicable to any debtor about to leave the Kingdom.